# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                    **CHAPTER 11**

**TEMPLAR CONSULTING, LLC**                  **CASE NO. 10-00334-8-RDD**

      **DEBTOR**

## ORDER GRANTING IN PART AND DENYING IN PART DEBTOR'S EMERGENCY MOTION FOR TURNOVER AND DENYING REQUEST FOR SANCTIONS

Pending before the Court is the Motion for Turnover filed by Templar Consulting, LLC (referred to herein as "Templar" or the "Debtor") on January 19, 2010 (the "Turnover Motion"), the Motion for Rejection of Executory Contract (the "Rejection Motion," collectively referred to herein with the Turnover Motion as the "Motions") and the Response in Objection to the Motion for Turnover[1] filed by Victory Arms, Inc., a Nevada Corporation ("Victory") on March 31, 2010 (referred to herein with the Brief in Support of Objection to the Motion for Rejection of Executory Contract and Motion Directing Turnover filed April 26, 2010 by Victory as the "Objection").  The Court conducted a hearing to consider the Motions and the Objection on April 27, 2010.

## PROCEDURAL HISTORY

1. On January 18, 2010, the Debtor filed for relief under chapter 11 of title 11 of the United States Code.

2. On January 19, 2010, the Debtor filed the Turnover Motion asserting that Victory was in possession of estate assets and requesting that an order be entered directing the turnover of

---

[1]Victory filed a Response in Opposition to the Rejection Motion on March 31, 2010. The Court granted the Rejection Motion and such ruling is addressed by a separate order of this Court.

certain assets by Victory to the Debtor. Attached to the Turnover Motion was a list of alleged estate assets in the possession of Victory.

3. With respect to the Rejection Motion, the Debtor sought to terminate a business relationship entered into by the Debtor and Victory.

4. On February 2, 2010, the Court conducted a hearing on the Turnover Motion and Rejection Motion. Based on the testimony of Bob Reynolds, managing member of the Debtor, and the lack of response to the Motions by Victory, the Court granted the Turnover Motion and the Rejection Motion and docketed orders consistent with its bench ruling.

5. On February 9, 2010, Victory filed its Motion to Set Aside and Reconsider Orders Granting Motion for Rejection of Executory Contract and Directing Turnover (the "Set Aside Motion") asserting that the Debtor failed to provide Victory with proper notice of the Motions. Victory asserts that the property listed in the Turnover Motion is not property of the estate of Templar; the agreement between Victory and the Debtor is not clear as to whether or not the agreement was with the Debtor or Mr. Reynolds, and that since Victory had commenced performance, rejection was not allowed.

6. On March 3, 2010, the Debtor filed its opposition to the Set Aside Motion arguing that (1) Victory was served notice of the filing of the petition at its physical address, which is the corporate address and address listed on its federal firearms license, (2) Victory received email notice of the Motions, (3) Victory had actual knowledge of the Motions, and (4) Victory disposed of property of the estate in violation of the automatic stay. Furthermore, the Debtor sought sanctions against Victory and Barnes Precision Machine (referred to in pleadings as Barnes

Machine Inc., Barnes Machine, Inc. and Barnes Precision; collectively referred to herein as "Barnes") in connection with alleged violations of the automatic stay by Victory and Barnes.

7. On March 8, 2010, Victory filed its Brief in Support of the Set Aside Motion.

8. On March 8, 2010, the Court conducted a hearing on the Set Aside Motion and the opposition filed by Templar.

9. After considering the pleadings filed in this case and the arguments of counsel, the Court granted the Set Aside Motion and required the Debtor to properly serve the Motions in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure. The Order granting the Motion to Set Aside was docketed on March 22, 2010.

10. On March 12, 2010, Barnes filed its response to the motion for sanctions included by the Debtor as part of the opposition to set aside.

11. On March 31, 2010, Victory filed its Opposition to the Motions asserting that the agreement which the Debtor seeks to reject is not a valid contract under North Carolina law which resulted in a joint venture or implied partnership relationship between the Debtor and Victory. Further, Victory contends that the lower receivers returned to Barnes were, in fact, property of the joint venture and not property of the Debtor's estate.

12. On April 26, 2010, Victory filed its Brief in Support of Objection to the Motion for Rejection of Executory Contract and Motion Directing Turnover.

## DISCUSSION

The Debtor and Victory entered into an agreement on or about September 11, 2009 whereby Victory agreed to purchase all assets of the Debtor for an investment/purchase price of $100,000. Upon execution of the agreement, Victory was to transfer three percent (3%) interest

3

to the Debtor or Bobb[ie] Neal Reynolds.[2] The agreement also provides that in the event the parties terminate the agreement, "both parties retain the right to use the Templar Line Intellectual Property." However, there is no definition as to what property is included within that definition. Based on the evidence before this Court, a provisional patent application was submitted on behalf of "Victory Arms - Templar" by Bobbie Neal Reynolds, Jr. on November 16, 2010. The provisional patent application had not been approved as of the date of this hearing. The agreement does not specifically address any licenses held by the Debtor, Mr. Reynolds, or Victory.

Victory does not dispute that it returned the lower receivers to Barnes subsequent to the filing of the petition for relief. In response to the allegation that it violated the automatic stay or transferred estate property, Victory alleges that the lower receivers for the weapons were property of a joint venture or property of Victory when they were returned to Barnes and that it had a right to return property for which it had been invoiced.

However, regardless of the proposed business organization suggested by the agreement or implied by the actions of the parties, one action of Victory compels the Court to determine that

---

[2]The agreement contains a number of contradictory terms. Seller is defined as Templar Consulting LLC and the agreement is executed on behalf of the limited liability company. However, paragraph 12 of the agreement provides that the "Seller, Bobb[ie] Neal Reynolds will not have any competing interest." Furthermore, paragraph 10 of the agreement states that "Seller will gift Templar Consulting LLC to Victory Arms, Inc." and then allow the Seller to purchase additional stock or receive incentive percentages based on sales. These provisions are circular when considering that Victory was to transfer three percent to the Seller, presumably Templar Consulting LLC, but then swallow up ownership of Templar Consulting LLC.

Furthermore, the Court is unable to decipher the meaning of certain provisions of the agreement such as "[b]uyer agrees to ensure a loan is made to the buyer..." However, since the parties agree that to the extent the agreement was an executory contract, its rejection by the Debtor is appropriate.

the lower receivers that Mr. Reynolds picked up from Barnes are, in fact, estate property – this action being that Victory reimbursed the Debtor $500.00 for the annual renewal tax of the Special Occupational Tax (the "SOT") that was in the name of Templar Consulting LLC.

The parties do not dispute that both Victory and the Debtor possess a Federal Firearm Licenses ("FFL") issued by the United States Department of Justice - Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"). However, possession of an FFL is not sufficient to manufacture or distribute certain types of firearms under the National Firearms Act of 1934. *See* 26 U.S.C. §§ 5801 et seq., Public Law 474, approved June 26, 1934 (the "NFA").

When enacted, the NFA sought to limit the accessibility of machineguns and other weapons often used by criminals in the 1930s by imposing a tax on the manufacture, distribution, or importation of certain weapons and also by creating a registry of such weapons that were not under the control of the United States. *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration Transfer Record, Evaluation and Inspections Report I-2007-006, June 2007, Office of the Inspector General,* http://www.justice.gov/oig/reports/ATF/e0706/back.htm (Downloaded May 28, 2010).

Problems arose with several of the provisions contained within the NFA. Therefore, subsequent to its enactment, Congress enacted the Gun Control Act of 1968 (the "GCA"), which cured the unconstitutional provisions of the NFA and also expanded the definition of "machinegun." *See* 18 U.S.C. §§ 921-930, Public Law 90-618, approved October 22, 1968. The GCA added that machinegun frames and receivers[3] to the scope of weapons under the NFA and

---

[3]The primary asset in dispute is the lower receivers that were returned to Barnes by Victory. These lower receivers fall within the definition of machinegun under the NFA and, therefore, are subject to the NFA transfer restrictions. 26 U.S.C. § 5845(b); *See also* National

5

modified the definition machinegun. *The Bureau of Alcohol, Tobacco, Firearms and Explosives'*

*National Firearms Registration Transfer Record, Evaluation and Inspections Report I-2007-006,*

*June 2007, Office of the Inspector General,*

http://www.justice.gov/oig/reports/ATF/e0706/back.htm (Downloaded May 28, 2010).

Furthermore, the GCA restricted registrations of NFA weapons to only makers, manufactures,

and importers. *Id.* More specifically, 26 U.S.C. § 5845 of the NFA provides:

> (b) Machinegun. The term 'machinegun' means any weapon which shoots is
> designed to shoot, or can be readily restored to shoot, automatically more than one
> shot, without manual reloading, by a single function of the trigger. The term shall
> also include the frame or the receiver of any such weapon, any part designed and
> intended solely and exclusively, or combination of parts designed and intended,
> for the use in converting a weapon into a machinegun, and any combination of
> parts from which a machinegun can be assembled if such parts are in the
> possession or under the control of a person.

A weapon itself does not necessarily need to function as a machinegun but must have the

design features that would allow for fully automatic firing by a simple modification or removal

of existing parts. Such are considered machineguns under the NFA. *S.W. Daniel, Inc. v. U.S.*,

831 F.2d 253 (11th Cir. 1987).

Possession of an NFA weapon that is not registered or is registered to someone else is

subject to a $250,000 fine and 10 years in prison. 26 U.S.C. § 5685; 18 U.S.C. § 3571.

---

Firearms Act Handbook, chapter 2, pp. 10-11, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco
Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8,
http://www.atf.gov/publications/firearms/nfa-handbook/ Revised April 2009)(Downloaded May
28, 2010)(noting that machineguns are the only type of firearms under the NFA where the
receiver of the weapon is a NFA firearm itself). Since there are specific limitations regarding the
transfer and manufacture of NFA weapons, a discussion of the requirements of the NFA and
GCA is necessary.

Different licensing requirements exist under the GCA and NFA. To engage in the business of importing, manufacturing, or dealing in GCA or NFA firearms, the entity or person must apply for and obtain a license. This license, commonly referred to as the FFL, is issued for three (3) years. 18 U.S.C. § 923(a). *See also* National Firearms Act Handbook, chapter 5, p. 30, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, http://www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010). If a business has multiple locations, a separate FFL must be obtained for each location. 27 C.F.R. § 478.50. *See also* National Firearms Act Handbook, chapter 5, p. 32, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010).

However, there is an additional requirement to import, manufacture, or deal in NFA firearms. FFL holders who manufacture, import, or deal with NFA weapons must also pay an SOT to conduct business. 26 U.S.C. § 5801, 27 C.F.R. § 479.36. *See also* National Firearms Act Handbook, chapters 5 and 7, pp. 33 and 40, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010). These FFL holders are licensed as "Special Occupational Taxpayers." National Firearms Act Handbook, chapter 5, p. 33, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8,

7

www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010).

On *first* engaging in business, the manufacturer, importer, or dealer in NFA firearms must pay the SOT tax for each place of business. *emphasis added.* <u>National Firearms Act Handbook</u>, chapter 4, p. 28, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010).  The dealer tax rate, due by July 1 of each year, is $500.00 and the special tax is paid by timely filing ATF E-Form 5630.7.[4]  *Id.  See also* 26 U.S.C. § 5801; ATF E-Form 5630.7.

---

[4]The Instruction Sheet for ATF E-Form 5630.7 - Special Tax Registration and Return - National Firearms Act (NFA) specifically provides in the General Instructions:

> If you are engaged in one or more of the National Firearms Act (NFA) activities listed on this form...required to file this form and pay special occupational tax before beginning business. This form is for NFA taxpayers only...If you engage in a taxable activity at more than one location, attach to your return a sheet showing your name, trade name, address and employer identification number, the complete street addresses, and the Federal Firearms Licenses (*FFL*) number of all additional locations. As evidence of tax payment, you will be issued a Special Tax Stamp, ATF Form 5630.6A, for each location and/or business. You must have an FFL for the location, appropriate to the type of activity conducted.  The type of business (*individual owner, partnership, corporation*) must be the same for the taxable activity and the FFL. If a trade name is used, it must be the same on the tax stamp and the FFL.

Section III of the Instruction Sheet addresses Changes In Operations:

> For a change of address, location or trade name, an amended ATF Form 5630.07 must be filed and approved before the change is made...All taxpayers with such changes must return their FFL to the ATF's Federal Firearms Licensing Center (*address listed on FFL*) for amendment.  If special taxpayers do not register these changes within appropriate time frames, additional tax and interest will be charged and penalties may be incurred.  For a change in ownership or control over an activity, consult the ATF Federal Licensing Center...before beginning the activity. If the

8

Upon completion of the proper forms, approval by the NFA Branch of the ATF, and payment of the SOT, the special occupational taxpayer[5] will be provided a special tax stamp as evidence of the tax payment. 27 C.F.R. § 479.36. *See also* National Firearms Act Handbook, chapters 4 and 5, pp. 28 and 33, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010). The information on the special tax stamp must be consistent with the information on the FFL. Therefore, before any NFA weapons could be manufactured or produced by Victory or

---

> Federal firearms licensee discontinues business and retains NFA firearms, this retention may be in violation of the law...

Section III also provides a definition provision:

> IMPORTERS, MANUFACTURERS, and DEALERS of FIREARMS subject to the National Firearms Act...are individuals or business entities who import, manufacture, or deal in machineguns, short-barreled shotguns and rifles, destructive devices, etc. See 26 U.S.C. § 5845 for additional information on the types of weapons subject to the National Firearms Act. ***(NOTE:*** *This tax is not required from those persons or entities who deal only in conventional, sporting type firearms.)*

Finally, the form provides Miscellaneous Instructions to the applicant:

> If you do not intend to pay the special tax for the next year, you must dispose of any machineguns manufactured or imported after May 19, 1986, prior to [the] special tax status lapsing. Title 18, United States Code, section 922(o) makes it unlawful to possess these machineguns unless you are properly qualified. As provided in Title 27, Code of Federal Regulations, Part 479[.]105(f), the disposition must be made to a government agency or qualified licensee or the weapon must be destroyed.

[5]The special occupational taxpayer is a person or entity qualified to import, manufacture, or deal in NFA firearms based upon its payment of the special occupational tax under the NFA. *See also* National Firearms Act Handbook, chapter 1, p. 2, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010).

Victory-Templar, the SOT would need to be obtained and there would need to be a corresponding FFL.

Criminal penalties and forfeiture exist for entities or individuals who violate the NFA or the GCA. 26 U.S.C. § 5861(a)-(l); 26 U.S.C. § 5685; 18 U.S.C. § 924(d). As allowed by the Internal Revenue Code, penalties and interest may be assessed for the tax liabilities under the NFA and license denial or revocation can occur under the GCA. *See also* <u>National Firearms Act Handbook</u>, chapter 15, p. 88, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010).

In order to determine if the lower receivers were property of the estate, the Court must first determine who was entitled to possess and/or distribute the receivers or the final product made from them. These receivers are clearly within the definition of a machinegun,[6] under the NFA as expanded by the GCA. Therefore, in order for Victory or Victory-Templar to transfer the receivers, it was required to have paid the SOT, thereby raising its FFL status to that of a special occupational taxpayer. There is nothing in the record before this Court that Victory or Victory-Templar (as an implied entity) possessed the SOT status. Although the parties agree that Victory possessed an FFL, an FFL alone is not sufficient to transfer weapons or receivers that fall under the NFA definition. Furthermore, there is nothing in the record indicating that the parties obtained or even applied for an FFL on behalf of Templar-Victory. Therefore, Victory-Templar could not have obtained the SOT.

---

[6] *See* 26 U.S.C. § 5845(b), which is set forth on page 6 of this opinion.

10

Victory introduced into evidence invoices from Barnes indicating that low receivers were picked up by the customer or by "Bob" and that the items were billed to Victory Arms or Victory - TVA. Although the items were billed to Victory Arms or Victory - TVA, without an SOT, neither of those entities would have had the authority under the NFA or GCA to transfer the receivers or completed rifles[7]. However, it appears to the Court that Templar maintained its status, not only as a FFL holder but also as a SOT.

By having both the FFL and SOT, Templar maintained its independence since Victory itself could not consummate the sale or transfer of a NFA weapon. And because Templar paid the SOT tax, Templar was entitled to not only possess the receivers, but could also manufacture the finished product for transfer or sale, or even transfer the receiver itself, subject to certain other ATF restrictions. Victory or Victory-Templar would have needed to obtain an SOT prior to engaging in the business of dealing in NFA firearms. There is nothing in the record that either entity took steps to pay the SOT tax on behalf of Victory-Templar. Without the SOT status, Victory is unable to transfer the lower receivers.[8]

Victory clearly saw value in Templar's SOT status as it reimbursed Templar Consulting LLC for the $500.00 tax related to the SOT. Victory introduced into evidence a copy of check number 1617, dated October 26, 2007 and made payable to Templar Consulting LLC. On the

---

[7]  Furthermore, though Victory possesses an FFL, there is no evidence in the record that Victory, in fact has the appropriate type FFL that permits it to manufacture firearms. The NFA also applies to certain rifles and other weapons. 26 U.S.C. § 5845. Arguably since Templar maintained its SOT status, Victory was willing to reimburse Templar for the cost of the SOT. The parties stated that they intended to manufacture the same type of weapons. Therefore, the SOT was required for the sale of the finished product.

[8]Certain transactions involving a non-SOT holder are permitted. However, those transactions are limited.

11

memo line of the check is the notation SOT.[9]  It is unlikely that had Victory maintained its own SOT status, it would have reimbursed Templar since it claims that the receivers were either property of Victory or the implied entity.

In order to comply with the various laws and regulations, Templar is the only entity out of the three which was entitled to transfer the receivers or other NFA weapons. There was no evidence presented that Templar changed its name in accordance with instructions set forth on ATF E-Form 5630.70 to Victory-Templar or Victory.[10]

Based on the facts that only an SOT can deal or manufacture NFA weapons; that the receivers fall within the definition of the NFA as redefined in the GCA; that Bob Reynolds was the individual who picked up the receivers; and that only Templar Consulting LLC possessed the SOT status,[11] the Court finds that the receivers were, in fact, property of Templar Consulting. Therefore, the lower receivers that Victory returned to Barnes were property of the estate and should have been turned over to Templar at its request.

Barnes is hereby directed to return the receivers specifically identified on the spreadsheet signed by Barnes and Victory to Templar within **thirty (30) days** of the entry of this Order.

---

[9]The parties do not dispute that this check was paid to Templar for reimbursement for payment of the SOT.

[10]In order to change its trade name, an FFL/SOT must obtain the approval of the Chief at the NFA Branch. National Firearms Act Handbook, chapter 13, p. 80, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E-Publication 5320.8, http://www.atf.gov/publications/firearms/nfa-handbook/ (Revised April 2009)(Downloaded May 28, 2010)(citing 27 C.F.R. 479.47). There is nothing in the record that indicates Templar sought such approval to change its name to Templar-Victory or Victory.

[11]Although certain regulations allow the transfer of NFA weapons to and from non-SOT holders, the fact that Victory reimbursed Templar its SOT fee implies to the Court that it intended to manufacture NFA weapons under Templar's SOT status.

12

As to the other equipment and assets requested in the Motion which have not been previously turned over to Templar, those items are not property of the estate. There is no evidence before the Court that those items were not intended for use by the Victory-Templar joint venture.  Furthermore, unlike the receivers, possession or transfer of these items is not restricted by federal, state, or local laws or regulations. Therefore, these items are not property of the Templar's bankruptcy estate.

Lastly, the motion for sanctions by Templar against Victory and Barnes based on alleged willful violations of the automatic stay is **DENIED**.  The facts and circumstances in this case do not rise to the level required to find a willful violation of automatic stay.

**SO ORDERED.**

**DATED:  JUNE 18, 2010**

United States Bankruptcy Judge

13

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives
*Office of Enforcement Programs and Services*



# ATF
# National Firearms
# Act Handbook



ATF E-Publication 5320.8
Revised: April 2009

Title II also amended the NFA definitions of "firearm" by adding "destructive devices" and expanding the definition of "machinegun."

**1.1.3 Firearm Owners' Protection Act.** In 1986, this Act amended the NFA definition of "silencer" by adding combinations of parts for silencers and any part intended for use in the assembly or fabrication of a silencer.[6] The Act also amended the GCA to prohibit the transfer or possession of machineguns.[7]    Exceptions were made for transfers of machineguns to, or possession of machineguns by, government agencies, and those lawfully possessed before the effective date of the prohibition, May 19, 1986.

**Section 1.2 Meaning of terms**. Certain terms and abbreviations used in this book are defined as follows:

**1.2.1** "AECA" means the Arms Export Control Act, 22 U.S.C. 2778.

**1.2.2** "ATF" means the Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Department of Justice.

**1.2.3** "ATF Ruling" means a formal ruling published by ATF stating its interpretation of the law and regulations as applied to a specific set of facts.

**1.2.4** "CFR" means the Code of Federal Regulations in which Federal firearms regulations are published.

**1.2.5** "DIO" means an ATF Director of Industry Operations responsible for regulating the firearms industry within an ATF field division.

**1.2.6** "FFL" means a Federal firearms licensee, person or entity having a license to import, manufacture, or deal in firearms under the GCA.

**1.2.7** "FTB" means ATF's Firearms Technology Branch.

**1.2.8** "GCA" means the Gun Control Act of 1968, 18 U.S.C. Chapter 44.

**1.2.9** "NFA" means the National Firearms Act, 26 U.S.C. Chapter 53.

**1.2.10** "NFRTR" means the National Firearms Registration and Transfer Record containing the registration of NFA firearms.

**1.2.11** "SOT" means a special occupational taxpayer, a person or entity qualified to import, manufacture, or deal in NFA firearms by having paid the special (occupational) tax to do so under the NFA.

---

[6] Firearm Owners' Protection Act, Public Law 99-308, approved May 19, 1986.
[7] 18 U.S.C. 922(o).



STEN MK II submachinegun

The definition of machinegun also includes the frame or receiver of a machinegun.



STEN MK II submachinegun receiver

Of all the different firearms defined as NFA weapons, machineguns are the only type where the receiver of the weapon by itself is an NFA firearm. As a result, it is important that the receiver of a machinegun be properly identified. Many machineguns incorporate a "split" or "hinged" receiver design so the main portion of the weapon can be easily separated into upper and lower sections. Additionally, some machineguns utilize a construction method where the receiver is composed of a number of subassemblies that are riveted together to form the complete receiver.

The following table lists specific models of machineguns incorporating the above designs and the portion of the weapon that has been held to be the receiver. This list is not all- inclusive. For information concerning a split or hinged receiver type machinegun not listed below, contact FTB at (304) 260-1699.

| Model | Receiver |
| --- | --- |
| Armalite AR10 | lower |
| Armalite AR15 (all variations) | lower |
| Armalite AR18 | lower |
| Beretta AR70 | lower |
| British L1A1 | upper |
| Browning M1917 | right side plate |
| Browning M1919 (all variations) | right side plate |
| Browning M2 & M2HB | right side plate |
| Colt M16 (all variations) | lower |
| Czech Vz 61 | lower |
| FN FNC | lower |
| Model | Receiver |
| FN CAL | upper |
| FN FAL | upper |

10

| | |
|---|---|
| French MAT 49 | upper |
| German MP38 & MP40 | upper |
| H&K G3 (all variations) | upper |
| H&K MP5 (all variations) | upper |
| IMI UZI | upper |
| M61 Vulcan | outer housing |
| M134 Minigun | outer housing |
| Maxim MG08 and 08/15 | right side plate |
| SIG AMT | upper |
| SIG STG 57 | upper |
| SIG 550 Series (all variations) | upper |
| Soviet PPsH 41 | upper |
| Soviet PPS 43 | upper |
| Steyr MPi 69 | upper |
| Steyr MPi 81 | upper |
| Thompson submachinegun (all variations) | upper |
| Vickers water cooled machineguns | right side plate |

The "designed to shoot automatically more than one shot without manual reloading by a single function of the trigger" portion of the definition relates to the characteristics of the weapon that permit full automatic fire. ATF has also held that the "designed" definition includes those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts. ATF has published rulings concerning specific firearms classified as machineguns based on this interpretation of the term "designed."[15]

Included within the definition of machinegun is any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun. This portion of the machinegun definition addresses what are commonly referred to as conversion kits. The "any part designed and intended solely and exclusively" language refers to a part that was produced for no other reason than to convert a weapon into a machinegun. Illustrated below are examples of such parts.



conversion sear for H&K semiautomatic firearms

---

[15] Appendix B (ATF Rulings 82-2, 82-8, 83-5)

11

# CHAPTER 4.  TAXES IMPOSED BY THE NFA

**Section 4.1  Taxes**

The NFA imposes tax on the making and transfer of firearms. The Act also requires annual payment of a special (occupational) tax (SOT) by licensees engaged in the business of manufacturing, dealing in, or importing NFA firearms. The NFA also provides for exemptions from the making, transfer, and special (occupational) taxes in specific situations.

**4.1.1  Making tax.**  A tax of $200 is imposed on the making of all NFA firearms made by other than qualified manufacturers of firearms.[56]  The tax must be paid prior to making the firearm.  Payment of the making tax is submitted with the Application to Make and Register a Firearm (ATF Form 1).  See Appendix C for a copy of Form 1.  The making tax is also imposed when a registered, unserviceable NFA firearm is reactivated.[57]  See the exemptions from tax discussed in Section 4.2.1.

**4.1.2  Transfer tax.**  Transfer of a serviceable NFA firearm is subject to the transfer tax.[58]  The tax must be paid prior to the transfer. Payment of the tax is submitted with the Application to Transfer and Register a Firearm (ATF Form 4). See Appendix C for a copy of Form 4. ATF will accept payment of the tax from either the transferor or transferee. The tax on the transfer of short barrel shotguns, short barrel rifles, machineguns, silencers and destructive devices is $200. The transfer tax for firearms classified as "any other weapon" is $5. See the exemptions from tax discussed in Section 4.2.2.

*NOTE*: there is often confusion concerning the tax on "any other weapons." The majority of NFA weapons are subject to a making tax of $200 and a transfer tax of $200. Many individuals have the mistaken belief that the rate of tax for making an "any other weapon" is $5 because the transfer tax on "any other weapons" is $5. As discussed in Section 4.1.1, the making tax on all types of NFA firearms is $200.

**4.1.3  Special (occupational) tax.**  On first engaging in business, each importer, manufacturer, and dealer in NFA firearms must pay a special (occupational) tax for each place of business.[59]  Special tax is paid by return, specifically ATF Form 5630.7, Special Tax Registration and Return.  Appendix C contains a copy of the return.  Subsequent to the initial payment of the SOT, the tax is due on or before July 1 of each year.  The rate of tax for importers and manufacturers is $1000 per year.  The rate of tax for dealers is $500 per year.  The NFA provides a reduced rate of SOT for importers and manufacturers whose gross receipts for the most recent taxable year are less than $500,000.[60]  See the exemptions from tax discussed in Section 4.2.3.

---

[56] 26 U.S.C. 5821
[57] ATF Form 1 (5320.1), Instruction k
[58] 26 U.S.C. 5811
[59] 26 U.S.C. 5801
[60] 26 U.S.C. 5801(b)(1)

# CHAPTER 5.  QUALIFYING TO DO BUSINESS IN NFA FIREARMS

**Section 5.1  Licensing under the GCA**

**5.1.1  Application for GCA license**.  Any "person" intending to engage in the business of importing, manufacturing, or dealing in NFA firearms, which are also defined as "firearms" under the GCA, must first apply for and obtain a license.[70]  The license application is ATF Form 7 (5310.12).  Appendix C contains a copy of the form.  Licenses are issued for a period of 3 years.

> **5.1.1.1  Definition of "person" for GCA purposes**.  The GCA defines "person" to include "any individual, corporation, company, association, firm, partnership, society, or joint stock company."[71]  ATF recognizes the term to include a limited liability company ("LLC") organized under State law.  Thus, an LLC must obtain a GCA license to engage in a GCA firearms business and ATF will issue a license to an LLC meeting the licensing standards.

**5.1.2  License fees**.[72]

> **5.1.2.1  Manufacturers**.  If the applicant is a manufacturer of destructive devices, the fee is $1,000 per year.  For firearms other than destructive devices, the fee is $50 per year.

> **5.1.2.2  Importers**.  If the applicant is an importer of destructive devices, the fee is $1,000 per year.  For firearms other than destructive devices, the fee is $50 per year.

> **5.1.2.3  Dealers**.  If the applicant is a dealer in destructive devices, the fee is $1,000 per year.  For firearms other than destructive devices, the fee is $200 for 3 years, except that the fee for renewal is $90 for 3 years.

**5.1.3  Licensing standards under the GCA**.[73]

> **5.1.3.1  Age.**  If the applicant is an individual, he or she must be at least 21 years of age.

> **5.1.3.2  Prohibited persons**.  Persons who fall within the prohibited persons categories set forth in 18 U.S.C. 922(g) and (n) do not qualify for licensing. The same is true of business entities having "responsible persons" under any one of the disabilities.

> **5.1.3.3  "Responsible persons."**  If the applicant is a corporation, partnership, or association (including an LLC), the applicant would not qualify for licensing if the entity itself has GCA disabilities under section 922(g) or (n) or has any individual possessing directly or indirectly the power to direct or cause the direction of the management and policies of the firm under disabilities.  These management and policy-making individuals include only those having responsibilities with respect to firearms.  For example, they would not include individuals only

---

[70] 18 U.S.C. 923(a); 27 CFR 478.44
[71] 18 U.S.C. 921(a)(1)
[72] 18 U.S.C. 923(a)(1); 27 CFR 478.42
[73] 18 U.S.C. 923(d)(1)

**5.1.4 Multiple business locations.** A separate license must be obtained for each    location at which business will be conducted.[76]

> **5.1.4.1 Locations solely for storage.** No license is required to cover a separate warehouse used by the FFL solely for storage of firearms if required records are maintained at the licensed premises served by the warehouse.[77]

**5.1.5 Establishing a common expiration date for licenses at multiple locations.** For the convenience of FFLs, ATF Ruling 73-9 (see Appendix C) provides that FFLs holding licenses at more than one location may establish a common expiration date for the licenses issued to their several locations. FFLs wishing to establish such a date for all licenses issued to them may apply in writing to the Federal Firearms Licensing Center.

**5.1.6 Engaging in business as both an importer and a manufacturer.** Persons intending to engage in business as firearms importers and manufacturers, even if the businesses will be conducted from the same premises, must have both an importer's license and a manufacturer's license.[78]

**5.1.7 Do importers and manufacturers need a dealer's license to deal in the firearms they import or manufacture?** Licensed importers and manufacturers are not required to have a separate dealer's license to deal in firearms they import or manufacture. A license as an importer or manufacturer authorizes the FFL to deal in the types of firearms authorized by the license to be imported or manufactured.[79]

**5.1.8 License renewal.** Licenses are issued for a 3-year period. Prior to the expiration of a license, the FFL will receive from ATF a license renewal application, ATF Form 8, that should be filed with ATF prior to the expiration date shown on the current license. If a Form 8 is not received 30 days before the expiration date, the FFL should contact ATF's Federal Firearms Licensing Center. It is the responsibility of the FFL to timely obtain and file a renewal application. Appendix C contains a copy of the form. ATF has 60 days within which to act on an original or renewal license application.[80]

> **5.1.8.1 Right to operate while renewal application is pending; "letters of continuing operations."** ATF's approval of a license renewal application may occur after the expiration date shown on the current license. If a license renewal application is timely filed, but not acted upon until after the expiration date of the applicant's current license, may the applicant lawfully conduct the business after that date? The law, 5 U.S.C. 558, allows an FFL to continue to lawfully conduct business under a current license until a timely filed renewal application is acted upon. To show the FFL's current suppliers that the license is still valid while the renewal application is pending, the FFL may obtain a "letter of continuing operations" from the Federal Firearms Licensing Center, showing that the transferee's license is still valid even though it appears on its face to have expired.

---

[76] 27 CFR 478.50
[77] Ibid
[78] 27CFR 478.41(b)
[79] Ibid
[80] 27 CFR 478.45

32

**Section 5.2  Payment of special (occupational) tax to do business in NFA firearms.**  See also Section 4.1.3.

**5.2.1  Every "person" who engages in the business of importing, manufacturing, or dealing in firearms (including pawnbrokers) shall pay a special tax.**[81]  The tax must be paid on or before the date of commencing the taxable business and every year thereafter on or before July 1.  The tax is not prorated and is computed for the entire tax year (July 1 through June 30), regardless of the portion of the year during which the taxpayer engages in business.  Persons commencing business at any time after July 1 in any year are liable for the tax for the entire tax year.

> **5.2.1.1  Definition of "person" for NFA purposes.**  For purposes of the NFA, "person" is defined as a "partnership, company, association, trust, estate, or corporation, as well as a natural person."[82]  ATF recognizes the term to include a limited liability company ("LLC") organized under State law.  Thus, an LLC engaged in an NFA firearms business must pay the NFA special tax.

**5.2.2  Tax must be paid for each business location.**  The special tax must be paid for each premises where business will be conducted.[83]

**5.2.3  Rate of tax.**

> **5.2.3.1  Importers and manufacturers.**  The tax is generally $1,000 a year or fraction thereof.[84] See 26 U.S.C. 5801(b) and 27 CFR 479.32a for the reduced tax rate for certain "small importers and manufacturers." Those entitled to the reduced tax rate are subject only to a $500 tax per year.

> **5.2.3.2  Dealers.**  The tax is $500 a year or fraction thereof.[85]

**5.2.4  How to pay special tax.**  Special tax must be paid by filing ATF Form 5630.7, Special Tax Registration and Return, together with a check or money order for the amount of the tax.  The form and tax payment must be sent to the Bureau of ATF, Attention NFA, P.O. Box 403269, Atlanta, Ga. 30384-3269.  Upon filing a properly completed Form 5630.7 and payment of the special tax, the taxpayer will be issued a special tax stamp as evidence of tax payment.[86]

> **5.2.4.1  Employer identification number (EIN).**  The tax return, Form 5630.7, must contain a valid EIN number issued by the Internal Revenue Service (IRS).  If the taxpayer does not have an EIN number, the IRS in the taxpayer's locality should be contacted to obtain a number.  The number may also be obtained by contacting the IRS on-line.

---

[81] 26 U.S.C. 5801
[82] 27 CFR 479.11
[83] 27 CFR 479.38
[84] 26 U.S.C 5801(a)(1)
[85] 26 U.S.C. 5801(a)(2)
[86] 27 CFR 479.36

# CHAPTER 7.  MANUFACTURING NFA FIREARMS

## Section 7.1  Qualifying to manufacture NFA firearms

**7.1.1  Licensing under the GCA**.  Persons intending to engage in the business of manufacturing NFA firearms that also meet the definition of "firearm" in the GCA must first apply for and obtain a GCA manufacturer's license.[98]  The license application is ATF Form 7 (5310.12).[99]   Appendix C contains a copy of the form. Licenses are issued for a period of 3 years. See Section 5.1 for a discussion of the license fees, licensing standards, and other provisions of the GCA relating to licensing.

**7.1.1.1  Engaging in business at multiple locations**.  A separate license must be obtained for each location where business will be conducted.[100]

**7.1.1.2  Engaging in business as both an importer and a manufacturer**.  Persons intending to engage in business as firearms importers and manufacturers, even if the business will be conducted from the same premises, must have both an importer's license and a manufacturer's license.[101]

**7.1.1.3  Do importers and manufacturers need a dealer's license to deal in the firearms they import or manufacture?**  Licensed importers and manufacturers are not required to have a separate dealer's license to deal in firearms they import or manufacture.[102]  A license as an importer or manufacturer authorizes the FFL to deal in the types of firearms authorized by the license to be imported or manufactured.

**7.1.1.4  Manufacturers of destructive devices**.  Manufacturers are reminded that if the firearms they manufacture include destructive devices, or if they solely manufacture destructive devices, they must apply for and obtain a license as a manufacturer of destructive devices.  They should also note that the fee for such license is generally $1,000 per year, rather than $50 per year for a license to manufacture firearms other than destructive devices.  A license is issued for a period of 3 years.  Qualifying to manufacture destructive devices also entitles the FFL to manufacture and deal in firearms other than destructive devices.[103]

**7.1.2  Payment of special (occupational) tax to do business in NFA firearms**. Every person who engages in the business of manufacturing NFA firearms must pay a special tax.[104]  The tax must be paid on or before the date of commencing the taxable business and every year thereafter on or before July 1. The tax is paid by filing ATF Form 5630.7, Special Tax Registration and Return, together with a check or money order for the amount of the tax.[105]  Appendix C contains a copy of the form.  The special tax

---

[98] 18 U.S.C. 923(a)
[99] 27 CFR 478.44(a)
[100] 27 CFR 478.50
[101] 27 CFR 478.41(b)
[102] ibid
[103] ibid
[104] 26 U.S.C 5801
[105] 27 CFR 479.34(a)

# CHAPTER 15.  PENALTIES AND SANCTIONS

**Section 15.1  NFA.**

**15.1.1  Criminal.**  The acts prohibited by the NFA and prosecutable as Federal offenses are listed in 26 U.S.C. 5861(a) through (l).  As provided by 26 U.S.C. 5871, any person who commits an offense shall, upon conviction, be sentenced to imprisonment for not more than 10 years or fined.  Although the fine specified in the statute is an amount not exceeding $10,000, an amendment to Federal law provides for a fine of not more than $250,000 in the case of an individual or $500,000 in the case of an organization.[224]

**15.1.2  Forfeiture**.  Any firearm involved in any violation of the NFA is subject to seizure and forfeiture.[225]

**15.1.3  Assessment of NFA tax.**  ATF may assess tax liabilities under the NFA, including penalties and interest, as provided by the Internal Revenue Code.[226]

**Section 15.2  GCA**.

**15.2.1  Criminal**.  The criminal penalties for violations of the GCA are provided for in 18 U.S.C. § 924.  The criminal penalties in the GCA include both felonies and misdemeanors.  For misdemeanors, the fines would be not more than $100,000 for individuals or $200,000 in the case of organizations.  The criminal provisions of the NFA are found in 26 U.S.C. § 5871.  As in the case of NFA offenses, fines for violation of the felony provisions would be not more than $250,000 in the case of an individual or $500,000 in the case of an organization.

**15.2.2  Forfeiture**.  The GCA also provides for the forfeiture of firearms and ammunition involved in certain violations of the GCA and other violations of the criminal laws of the United States in 18 U.S.C. 924(d).

**15.2.3  License denial or revocation**.  ATF may issue a notice of denial of an application for a Federal firearms license where it determines that the applicant fails to meet the licensing requirements of 18 U.S.C. 923(d).[227]  It may also issue a notice of revocation of a license when it determines that an FFL has willfully violated the GCA or its implementing regulations.[228]  For the applicable procedures, see ATF's regulations in 27 CFR Part 478, Subpart E.  Note that the courts have held that a person's conduct was  "willful" where the evidence showed that the FFL knew of his legal obligation and disregarded or was plainly indifferent to that obligation.[229]

---

[224] 18 U.S.C. 3571(b) and (c)
[225] 26 U.S.C. 5872
[226] 27 CFR 479.191
[227] 27 CFR 478.47, 478.71
[228] 18 U.S.C. 923(e); 27 CFR 478.73
[229] Bryan V. United States, 524 U.S. 184 (1998) [note: this is criminal case, not civil license revocation.]

# CHAPTER 13.  REQUIRED REPORTS AND NOTIFICATIONS TO ATF

**Section 13.1  Change of business address**.

**13.1.1 GCA requirements.**  Technically, a change in an FFL's/SOT's business address does not trigger an ATF "notification" or "reporting" requirement under the GCA.  Rather, it requires the FFL to apply for and receive an amended license before business may be resumed at the new business location.  GCA regulations require that an application for an amended license, ATF Form 5300.38, be filed not less than 30 days prior to the change with the Chief, Federal Firearms Licensing Center (FFLC).[201]  The application must be accompanied by the FFL's original license.  The FFLC may also require the applicant to submit an original license application on ATF Form 7, or may issue an amended license if the applicant is determined to be qualified to do business at the new location.  The amended license is valid for the remainder of the term of the original license.

> **13.1.1.1 Application for amended license**. Moving a licensed business to a new location requires careful planning. In completing the application for an amended license, the FFL will be asked if there are any restrictions, covenants, or zoning ordinances prohibiting the conduct of business at the new premises. The FFL must also attach to the application copies of any State license or permit required to conduct the business, as well as evidence of payment of any required State or local business tax. The FFL must also certify that notification has been given to the chief law enforcement officer (the sheriff, chief of police, or equivalent officer) at the new location that the FFL intends to file the application. If ATF determines that the firearms business may not be lawfully conducted at the new location, the application will be denied.

**13.1.2 NFA requirements.**  If the FFL is qualified to do business in NFA firearms, the FFL may not lawfully conduct business in NFA firearms at the new location without the approval of the Chief, NFA Branch.[202]  The regulations require the FFL/SOT to file Form 5630.7 with ATF, bearing the notation "Removal Registry" and showing the new address to be used.  The FFL/SOT must also send the current special tax stamp to ATF, as well as a letter application requesting the amendment of the registration.  Upon approval, the NFA Branch will return the special tax stamp, amended to show the new business location.

**Section 13.2  Change in trade name**

**13.2.1 GCA requirements**.  GCA regulations provide that an FFL is not required to obtain a new license by reason of a mere change in trade name, provided the license is sent for endorsement of the change to the Chief, Federal Firearms Licensing Center within 30 days from the date the business starts using the new name.[203]

**13.2.2 NFA requirements**.  An FFL/SOT may not continue business in these types of firearms under a new trade name without the approval of the Chief, NFA Branch.[204]  To obtain approval, the regulations

---

[201] 27 CFR 478.52
[202] 27 CFR 479.46
[203] 27 CFR 478.53
[204] 27 CFR 479.47

# The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms
# Registration and Transfer Record

**Evaluation and Inspections Report I-2007-006**
**June 2007**
**Office of the Inspector General**

# Background

On June 26, 1934, Congress passed the National Firearms Act (NFA), since amended, to limit the availability of machine guns, short-barreled shotguns, short-barreled rifles, sound suppressors (silencers), and other similar weapons that were often used by criminals during the Prohibition Era.[10] The NFA imposed a tax on the manufacture, import, and distribution of NFA weapons and required a registry of "all NFA firearms in the United States that were not under the control of the United States [government]."[11] The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) collects the taxes and maintains NFA weapon registration records in a central registry. This central registry, called the National Firearms Registration and Transfer Record (NFRTR), consists of all registration documents, attachments to those documents, and an electronic database that includes information from many of the documents and that enables computerized searches of the registry.[12]

Congress expanded the scope of the NFA through the Gun Control Act (GCA) of 1968 to include destructive devices (e.g., explosive and incendiary bombs, flash bang grenades, and weapons with a bore of greater than one-half inch in diameter), machine gun frames or receivers, and conversion kits for machine guns.[13] The GCA restricts registrations of NFA weapons to only makers, manufacturers, and importers.[14] Private citizens or individuals who meet eligibility under the NFA are allowed to purchase, sell, possess, and transfer only previously registered NFA weapons. Further, the GCA called for a 30-day amnesty period ending December 1, 1968, where anyone possessing an NFA weapon could register the weapon without consequence. However, any NFA weapon not registered during the amnesty is considered contraband, cannot be registered, and must be forfeited or voluntarily surrendered to ATF. On May 19, 1986, Congress passed the Firearms Owners' Protection Act to prohibit possession of machine guns that were not legally possessed prior to its enactment. Thus, the Firearms Owners' Protection Act allowed newly manufactured machine guns to be available only to the U.S. government (such as the U.S. military) and law enforcement entities after May 19, 1986.

NFA weapons must be registered with the NFRTR, and whenever ownership is transferred (through sale, rental, gift, or bequest) the transfer must be approved in advance by ATF and then updated in the registry. A registrant is required to retain the approved NFA weapons application form as proof of a weapon's registration and make it available to ATF upon request.[15] Manufacturers, importers, and makers of NFA weapons also are required to register each newly made, manufactured, or imported weapon. Law enforcement agencies are allowed to register weapons that have been seized or voluntarily surrendered to the U.S. government.

As of November 2006, the NFRTR contained registrations for 1,906,786 weapons. The total number of weapons included 1,186,138 destructive devices, 391,532 machine guns, 150,364 silencers, 95,699 short barreled shotguns, 33,518 short barreled rifles, 48,443 weapons categorized as "any other weapons," and 1,082 "unknown" devices or weapons

not classified in the other categories.[16] Figure 1 illustrates the breakdown of the weapons in the NFRTR.

### Figure 1: Weapons in the NFRTR as of November 2006



Source: ATF, NFRTR data

Each record in the NFRTR contains the make, model, and serial number of the weapon, the date of its registration, and the name and address of the person entitled to possess the weapon. Each record also includes the transaction history for the weapon. For weapons registered prior to 1983, the NFRTR contains record entries of the three most recent transactions.[17] After 1983, the records contain all transactions. Another database linked to the NFRTR database contains electronic images of the related application forms for both pre- and post-1983 registered weapons.

Possessing an unregistered NFA weapon or one that is registered to someone else is punishable by a $250,000 fine and 10 years imprisonment.[18] The NFA weapon is subject to forfeiture, and if convicted of a criminal violation of the NFA the possessor will be prohibited from receiving or possessing firearms.[19]

In 2006, ATF seized 3,030 NFA weapons, including 1,280 machine guns, 550 sawed-off shotguns and rifles, 571 silencers, 415 destructive devices, and 214 devices categorized as "any other weapons." These totals included unregistered NFA weapons seized during criminal investigations as well as registered and unregistered NFA weapons seized as a result of compliance inspections of federal firearms licensees.

### ATF's NFA Branch

The NFA Branch, under ATF's Firearms and Explosives Services Division, Office of Enforcement Programs and Services, maintains the NFRTR and processes applications, requests for information, and notices associated with the manufacture, registration, transfer, and transportation of NFA weapons. In 2006, the NFA Branch processed and

entered 402,151 NFA weapons applications forms into the NFRTR. The NFA Branch assists registrants of NFA weapons and members of the firearms industry in complying with federal law and regulations regarding the possession, transport, and transfer of NFA weapons; reports of loss or theft of an NFA weapon or registration document; and other issues regarding changes concerning NFA weapons registration. Additionally, the NFA Branch conducts queries of the NFRTR to support compliance inspections and criminal investigations.

NFA Branch Staffing and Duties

In 2005, NFA Branch operations relocated to Martinsburg, West Virginia, from Washington, D.C., leaving only the Program Manager at ATF headquarters. As of March 2007, the NFA Branch had a staff of 20 ATF personnel and 12 contractors. The NFA Branch is authorized to have a complement of 16 Examiners, 8 Specialists, 1 Special Occupational Tax (SOT) Specialist, and 1 Information Technology (IT) Specialist. As of March 2007, it had only 10 Examiners, 4 Specialists, 1 SOT Specialist, and 1 IT Specialist. Also, 1 of the 10 Examiners was working in ATF's Explosives Licensing Center due to a staffing shortage in that organization, and 1 of the 4 Specialists was detailed to ATF headquarters. Table 1 shows the staffing levels and summarizes the duties of each position.

**Table 1: NFA Branch Staffing Levels as of March 2007**

| Position | Number of Employees on Board | Number of Employees Authorized | Duties |
|---|---|---|---|
| *ATF Personnel* | | | |
| Branch Chief | 1 | 1 | Supervises the NFA Branch. Decides policy and program changes. |
| Section Chief | 2 | 2 | Supervises Legal Instrument Examiners. |
| Program Manager (Washington, D.C.) | 1 | 1 | Advises the Branch Chief and other officials on policy decisions, NFA Branch program direction, and proposed changes to the NFRTR system. |
| Specialist | 4 | 8 | Performs records checks and produces inventory reports for ATF Special Agents and IOIs. (One Specialist is detailed to ATF headquarters.) |
| Special Occupational Tax (SOT) Specialist | 1 | 1 | Reviews and processes SOT applications and renewals. |

| | | | |
|---|---|---|---|
| Legal Instrument Examiner | 10 | 16 | Processes NFA applications. (One Examiner works in ATF's Explosives Licensing Center due to a staffing shortage.) |
| IT Specialist | 1 | 1 | Develops additional queries of the NFRTR, develops methods to fix errors in the NFRTR, and tracks Branch productivity. |
| **Contractors** | | | |
| Data Entry Clerk | 7 | N/A | Enters application data from paper forms into NFRTR. |
| Imaging Contractor (National Tracing Center) | 2 | N/A | Scans and indexes NFRTR documents into an electronic imaging database. |
| Customer Service Representative | 3 | N/A | Receives NFA-related phone calls and answers questions from the NFA community and ATF field offices. |

Source: ATF

Figure 2 shows the structure of the NFA Branch as of March 2007.

**Figure 2: NFA Branch Organizational Chart**

*[Image Not Available Electronically]*

Note: ATF's National Tracing Center – which traces the history of recovered crime guns for federal, state, local, and international enforcement agencies – manages an imaging services contract for all ATF branches.

NFA Weapon Registration Process

To register a new NFA weapon or transfer a registered NFA weapon, applicants must complete an ATF application form and submit it to the NFA Branch for review and approval. Only licensed manufacturers, licensed importers, or makers of NFA weapons may register an NFA weapon. Private citizens can apply for a transfer of a previously registered NFA weapon if the transfer is by sale, gift, or bequest. The NFA Branch staff

receives NFA weapons application forms, checks them for completeness, and enters the transaction information into the NFRTR. NFA Branch Examiners check the information in the database against the paper applications for accuracy and verify the applicants' compliance with state and federal regulations. If an application is incomplete or incorrect, the Examiner sends a correction letter to the applicant and allows 30 days for the applicant to submit additional information. If the application is approved, the Examiner retains a copy for the NFA Branch records and sends the original application back to the applicant, who is required to maintain it as proof of registration. The copied forms are "imaged" into an electronic database by contractors and then stored in the NFA Branch archives. See Appendix I for a full list of NFA application forms and transaction processes.

<u>NFA Weapons Records Checks and Inventory Report Requests</u>

NFA Branch Specialists respond to requests for records checks and inventory reports from ATF Special Agents and Industry Operations Investigators (IOI).[20] IOIs request NFA weapons inventory reports as part of compliance inspections they conduct of federal firearms licensees. Special Agents submit request forms for records checks of NFA weapons owners or specific NFA weapons related to their investigations. An NFA Branch Specialist searches the NFRTR database using multiple queries to find the record for the individual or weapon and returns a search report to the Agent.

**Funding for NFRTR Improvements**

In fiscal year (FY) 2001, Congress appropriated $2 million for management and technical improvements at ATF's NFA Branch, Firearms and Explosives Imports Branch, and National Licensing Center.[21] ATF used this funding for system development activities to consolidate and standardize separate information technology (IT) systems, streamline IT processes, and improve information access and usefulness for both ATF and the public.[22] In FY 2002, Congress provided another $2 million to ATF for the three branches and also provided $500,000 specifically to improve the NFRTR. To reduce processing time for NFRTR transactions, ATF used the funding to support imaging and indexing records within the NFRTR and linking the records to a retrieval system.[23] ATF also used the funds to develop the requirements document for an electronic filing system for three NFA forms and the prototype system and to modify the prototype based on feedback received from the NFA weapons industry.

———————

**Footnotes**

10. 26 U.S.C. § 5845 (1986).

11. 26 U.S.C. § 5845. NFA applicants must pay a $200 tax each time they make or transfer an NFA weapon. Further, manufacturers, importers, and dealers must pay a Special Occupational Tax (SOT) to do business in NFA weapons and are licensed as Special Occupational Taxpayers. Manufacturers and importers are taxed $1,000 each year and dealers are taxed $500.

12. The NFRTR was automated in 1983.

13. The GCA also defined the term "firearm" to exclude antique firearms or any devices (excluding machine guns and destructive devices) that could be classified as collectors' items. 26 U.S.C. § 5845. Flash bang grenades are non-lethal,

pyrotechnic distraction devices used by law enforcement agencies, the military, and movie and television productions. Receivers can convert a semi-automatic weapon into an automatic weapon firing multiple shots with on function of the trigger.

14. NFA weapons makers are unlicensed individuals who usually make one weapon at a time for individual use. NFA weapons manufacturers are licensed to manufacture weapons for sale and pay an annual Special Occupational Tax.

15. 26 U.S.C. § 5841(e).

16. Of the 1,186,138 destructive devices in the NFRTR, 77.4 percent (918,517) are flash bang grenades. The category "unknown" includes older weapons or devices registered with ATF before the NFRTR was automated that are not clearly identified or do not fit in any other category of weapon. According to 26 U.S.C. § 5845 (1986), " any other weapon" means "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition."

17. When the NFRTR was automated in 1983, the NFA Branch chose to focus on entering all transaction information for newly registered weapons, so NFA Branch staff entered only the three most recent records for each NFA weapon registered prior to 1983. A full transaction history of a pre-1983 weapon is available in the imaging database, which contains scanned copies of original application forms. All transactions of an NFA weapon registered after 1983 are entered into the NFRTR.

18. 26 U.S.C. § 5871, 18 U.S.C. § 3571.

19. 26 U.S.C. § 5872, 18 U.S.C. § 922(g)(1).

20. IOIs conduct inspections of federal firearms licensees for compliance with federal firearms laws and regulations.

21. The Firearms and Explosives Imports Branch reviews and processes applications for the importation of firearms, ammunition, and explosives into the United States. The National Licensing Center, now called the Federal Firearms Licensing Center, reviews and processes applications for federal firearms licenses. The center also maintains a searchable federal firearms licensee database.

22. House Report 107-152.

23. House Report 107-152.